Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

HAYATO ONO, derivatively on behalf of
THE HONEST COMPANY, INC.,

  Plaintiff,

  v.

NIKOLAOS VLAHOS, KELLY
KENNEDY, JESSICA WARREN,
KATIE BAYNE, SCOTT DAHNKE,
SUSAN GENTILE, ERIC LIAW,
JEREMY LIEW, AVIK PRAMANIK
and JAMES WHITE,

  Defendants,

  and

THE HONEST COMPANY, INC.,

  Nominal Defendant.

Case No.:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DEMAND FOR JURY TRIAL

**INTRODUCTION**

Plaintiff Hayato Ono ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant The Honest Company, Inc. ("Honest" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Nikolaos Vlahos ("Vlahos"), Kelly Kennedy ("Kennedy"), Jessica Warren a/k/a Jessica Alba ("Warren"), Katie Bayne ("Bayne"), Scott Dahnke ("Dahnke"), Susan Gentile ("Gentile"), Eric Liaw ("Liaw"), Jeremy Liew ("Liew"), Avik Pramanik ("Pramanik"), and James White ("White") (collectively, the "Individual Defendants," and together with Honest, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Honest, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Honest, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Honest's directors and officers between May 5, 2021 through August 12, 2021 (the "Relevant Period") involving misleading statements and omissions made in connection with the Company's May 2021 initial public offering of stock (the "IPO"),

failures to correct the misleading statements and omissions, and additional misleading statements made subsequently to the IPO.

2.     Honest is a consumer products company focused on the "clean lifestyle movement." Honest seeks to develop clean, sustainable, effective, and thoughtfully designed products. The Company's three product categories are Diapers and Wipes, Skin and Personal Care, and Household and Wellness, which represented 63%, 26%, and 11% of the Company's 2020 revenue, respectively.

3.     At the onset of the COVID-19 pandemic, consumer demand for the Company's diapers and wipes surged. In the second quarter of 2020, the Company's Diapers and Wipes category grew 19% compared to the second quarter of 2019 due to consumer stock-up purchases.

4.     Despite widespread awareness of stockpiling behavior during the early stages of the pandemic, the Company undertook measures to bolster its supply chain, such as securing secondary suppliers and ensuring sufficient inventory to support growth (the "Stockpiling Misconduct"). As a result, for the six months ended June 30, 2021, the Company had a $5.7 million increase in inventory, which it attributed to the timing of inventory purchases.

5.     Honest filed a registration statement on Form S-1 with the SEC on April 9, 2021 in order to pursue its IPO. After two amendments, the Form S-1 was declared effective on May 4, 2021 and was utilized to conduct the IPO. The Form S-1, and all amendments thereto are collectively referred to herein as the "Registration Statement." A final prospectus was filed on May 6, 2021 (the "Prospectus").

6.     Shortly before the IPO, in April 2021, the Board approved a $35 million dividend to holders of its common stock and redeemable convertible preferred stock as of May 3, 2021, which was paid on June 29, 2021.

7.     Honest's common stock began trading on the Nasdaq Global Select Market ("NASDAQ") on May 5, 2021, and the Company completed its IPO on May 7, 2021. In

the IPO, the Company sold 6.45 million shares and existing stockholders sold 23.22 million shares. The offering price was $16.00 per share, and the Company received aggregate net proceeds of approximately $91.1 million.

8.      In the Registration Statement and throughout the Relevant Period, the Individual Defendants made or caused the Company to make false and misleading statements and omissions of material fact necessary to prevent the statements from being misleading.  Specifically, the Individual Defendants touted the Company's financial results while failing to disclose that the Company's financial health was being adversely affected by stockpiling behaviors, that demand for the Company's products was decelerating, and that, simultaneously, the Company was engaging in the Stockpiling Misconduct.

9.      The Individual Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock at and around the time of the Company's IPO and throughout the Relevant Period.

10.     The truth emerged on August 13, 2021, before the market opened, when the Company issued a press release announcing financial results for fiscal quarter ended June 30, 2021. The Company reported a net loss of $20 million for the quarter, as compared with a net loss of only $0.4 million in the same quarter of 2020. The Company disclosed "an estimated $3.7 million COVID-19 stock-up impact primarily in Diapers and Wipes in the prior year period." It further disclosed that revenue in Diapers and Wipes declined 2% compared to the same quarter of 2020. Furthermore, Household and Wellness revenue declined 6% compared with the second quarter of 2020 "as consumer and customer demand for sanitization products decreased as consumers became vaccinated and customers managed heavy levels of inventory."

11.     On this news, the Company's share price fell $3.98, or 28%, to close at $10.07 per share on August 13, 2021. On August 19, 2021, the Company's share price closed at $9.16 per share. Thus, the Company's stock price declined nearly 43% from the IPO price per share of $16.00.

12.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*: (1) the Company's financial results were significantly impacted by stockpiling of the Company's products; (2) despite the negative implications of consumer and customer stockpiling behavior on the Company's future sales, the Company engaged in the Stockpiling Misconduct to support growth that was not reasonably likely to materialize; (3) the Company was experiencing decelerating demand for its products; (4) as a result of the foregoing, the Company's financial results were likely to be adversely impacted; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Honest's public statements were materially false and misleading at all relevant times.

13.     Throughout the Relevant Period, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the Stockpiling Misconduct, resulting in the waste of corporate assets.

15.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls, including by failing to establish an internal audit function.

16.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its founder and Chief Creative Officer ("CCO"), and five of its non-employee directors

(collectively, the "Class Action Defendants")[1] to two securities fraud class actions lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Actions"), and further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.   The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.   In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Class Action Defendants' liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

---

[1] The "Class Action Defendants" are as follows: CEO Vlahos, CFO Kennedy, CCO Warren, and directors Bayne, Dahnke, Liaw, Liew, and Pramanik.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because Honest's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

23.     Plaintiff is a current shareholder of Honest. Plaintiff has continuously held Honest common stock at all relevant times.

**Nominal Defendant Honest**

24.     Honest is a Delaware corporation with its principal executive offices at 12130 Millennium Drive, #500, Los Angeles, California 90094. Honest's shares trade on the NASDAQ under the ticker symbol "HNST."

**Defendant Vlahos**

25.     Defendant Vlahos has served as the Company's CEO and as a Company director since March 2017. According to the Prospectus, and given that the underwriters fully exercised their option to purchase additional shares, Defendant Vlahos beneficially owned 3,587,470 shares of the Company after the IPO. Given that the price of the Company's common stock was $19.08 when markets closed on May 7, 2021, when the IPO was completed, Defendant Vlahos beneficially owned approximately $68.45 million worth of Honest stock.

26.     According to the Prospectus, Defendant Vlahos' annual base salary is $825,000, and he is eligible for an annual target cash incentive payment equal to 50% of his annual base salary.

Verified Shareholder Derivative Complaint

27.    The Prospectus stated the following about Defendant Vlahos:

**Nikolaos Vlahos** has served as our Chief Executive Officer and as a member of our board of directors since March 2017. Prior to joining us, from September 2014 to March 2017, Mr. Vlahos served as Executive Vice President and Chief Operating Officer – Household, Lifestyle and Core Global Functions of The Clorox Company, a global manufacturer of consumer products, where he was responsible for the Charcoal, Glad, Cat Litter, Food, Brita and Burt's Bees business operating units as well as the company's Marketing, Sales, Product Supply and Research and Development functions. Mr. Vlahos initially joined The Clorox Company in 1995 as a Chicago regional sales manager and held numerous roles within The Clorox Company's sales and marketing organization before serving as Vice President – General Manager, Burt's Bees from April 2011 to February 2013 and Vice President – General Manager, Laundry, Brita and Green Works from March 2009 to February 2011. Before joining The Clorox Company, Mr. Vlahos worked at Helene Curtis where he assisted in the development of brands such as Degree and Suave. Mr. Vlahos holds a B.A. degree in telecommunications from Indiana University. We believe that Mr. Vlahos is qualified to serve on our board of directors due to his knowledge of our Company gained from his position as Chief Executive Officer, as well as his over 30 years of experience in the consumer packaged goods industry.

### Defendant Kennedy

28.    Defendant Kennedy has served as the Company's CFO since January 2021.

29.    The Prospectus stated the following about Defendant Kennedy:

**Kelly Kennedy** has served as our Executive Vice President, Chief Financial Officer since January 2021. Prior to joining us, from September 2018 to January 2021, Ms. Kennedy served as Chief Financial Officer of Bartell Drugs, a family-owned pharmacy chain. Ms. Kennedy has served on the board of directors of Vital Farms Inc. since December 2019 and FirstFruits Farms LLC since December 2019. Prior to that, Ms. Kennedy served on the board of directors of Sur La Table, Inc. from September 2018 to November 2020 and served as the Chief Financial Officer of Sur La Table, Inc. from June 2015 to September 2018, as the Chief Financial Officer of See's Candies from January 2014 to June 2015 and as the Chief Financial Officer and Treasurer of Annie's Inc. from August 2011 to November 2013. Ms. Kennedy has also served in various roles at Revolution Foods, Inc., Established Brands, Inc., Serena & Lily Inc., Forklift Brands, Inc., Elephant Pharm, Inc., Williams-Sonoma, Inc. and Dreyer's Grand Ice Cream Holdings, Inc. Ms. Kennedy received her

M.B.A. from Harvard Business School and her B.A. in Economics from Middlebury College.

### Defendant Warren

30.     Defendant Warren founded the Company and has served as the Company's CCO since July 2011. In addition, she served as Chair of the Board from May 2018 to May 2021. Defendant Warren is also known as Jessica Alba, and has held various prominent positions in the public sphere, including as a business leader, advocate, actress, and author. According to the Prospectus, and given that the underwriters fully exercised their option to purchase additional shares, Defendant Warren beneficially owned 5,645,118 shares of the Company after the IPO. Given that the price of the Company's common stock was $19.08 when markets closed on May 7, 2021, when the IPO was completed, Defendant Warren beneficially owned approximately $107.71 million worth of Honest stock.

31.     According to the Prospectus, Defendant Warren's current annual base salary is $600,000, which will increase to $700,000 effective February 1, 2022. In addition, she is eligible for an annual target cash incentive payment equal to 55% of her annual base salary, which amount will increase to 70% of her then-current base salary starting January 1, 2022.

32.     The Prospectus stated the following about Defendant Warren:

**Jessica Alba** is one of our founders and has served as our Chief Creative Officer since our incorporation in July 2011 and served as Chair of our board of directors from May 2018 to May 2021. Ms. Alba is a globally recognized and influential Mexican-American business leader, entrepreneur, advocate, actress, and New York Times bestselling author. Ms. Alba serves on the board of directors of Baby2Baby, a charitable organization that provides diapers, clothes and other basic necessities to children living in poverty. We believe that Ms. Alba is qualified to serve on our board of directors due to her knowledge and insights in founding and developing our company in addition to her industry experience and knowledge.

### Defendant Bayne

33.     Defendant Bayne has served as a Company director since October 2018. She served as Chair of the Compensation Committee and as a member of the Audit Committee

during the Relevant Period. According to the Prospectus, and given that the underwriters fully exercised their option to purchase additional shares, Defendant Bayne beneficially owned 75,000 shares of the Company after the IPO. Given that the price of the Company's common stock was $19.08 when markets closed on May 7, 2021, when the IPO was completed, Defendant Bayne beneficially owned approximately $1.43 million worth of Honest stock.

34.     According to the Prospectus, Defendant Bayne receives a $50,000 annual cash retainer for service as a non-employee director, a $15,000 annual cash retainer for service as Chair of the Compensation Committee, and a $15,000 annual cash retainer for service as a member of the Audit Committee, in addition to certain grants of equity compensation.

35.     The Prospectus stated the following about Defendant Bayne:

**Katie Bayne** has served as a member of our board of directors since October 2018. Since February 2019, Ms. Bayne has served as a Senior Advisor with Guggenheim Securities, the investment banking and capital markets division of Guggenheim Partners. Since March 2018, Ms. Bayne has also served as founder and President of Bayne Advisors, an advisory firm that helps brands and businesses find their strategic identities, drive sustained consumer engagement and innovate for transformative results. Prior to serving in her current roles, from 1989 to 2018, Ms. Bayne served in numerous roles at The Coca-Cola Company focused on consumer strategy, retail marketing and consumer marketing in the United States, Australia and globally, most recently serving as the company's President, North America Brands, from 2013 to 2015 and Senior Vice President, Global Center, from 2015 to 2018. Ms. Bayne previously served as a member of the board of directors for Ascena Retail Group, Inc., Ann Inc. and Beazer Homes USA. Ms. Bayne currently serves as a member of the board of directors for Acreage Holdings, Inc., a publicly traded company. Ms. Bayne is also a member of the board of trustees of the American Film Institute and the Fuqua School of Business at Duke University. Ms. Bayne holds a B.A. in Psychology from Duke University and an M.B.A. from Duke University's Fuqua School of Business. We believe that Ms. Bayne is qualified to serve on our board of directors due to her strong background in consumer strategy, retail and consumer marketing and brand management.

**Defendant Dahnke**

36. Defendant Dahnke has served as a Company director since June 2018. According to a Form 4 filed by Dahnke with the SEC on May 10, 2021, Defendant Dahnke is one of two members of a managing board of the general partner of THC Shared Abacus, LP, which sold 19,017,945 shares of the Company's Common stock on May 7, 2021 at a price of $16 per share, for proceeds of $304,287,120. According to the Prospectus, and given that the underwriters fully exercised their option to purchase additional shares, Defendant Dahnke beneficially owned 12,169,803 shares of the Company after the IPO, or 13.5% of the Company. Given that the price of the Company's common stock was $19.08 when markets closed on May 7, 2021, when the IPO was completed, Defendant Dahnke beneficially owned approximately $232.20 million worth of Honest stock.

37. According to the Prospectus, Defendant Dahnke receives a $50,000 annual cash retainer for service as a non-employee director, in addition to certain grants of equity compensation.

38. The Prospectus stated the following about Defendant Dahnke:

**Scott Dahnke** has served as a member of our board of directors since June 2018. Since January 2016, Mr. Dahnke has served as Co-Chief Executive Officer of *L* Catterton, a consumer-focused private equity firm, after previously serving as Managing Partner from February 2003 to December 2015. Prior to joining *L* Catterton, Mr. Dahnke was Managing Director of Deutsche Bank Capital Partners, the former private equity division of Deutsche Bank AG, from 2002 to 2003, and Managing Director of AEA Investors from 1998 to 2002. Previously, Mr. Dahnke was Chief Executive Officer of infoGROUP (formerly known as Info USA), a provider of data and data-driven marketing services, from 1997 to 1998. Prior to joining infoGROUP, Mr. Dahnke served clients on an array of strategic and operational issues as a Partner at McKinsey & Company. Mr. Dahnke's early career also includes experience in the Merger Department of Goldman, Sachs & Co. and with General Motors. Mr. Dahnke currently serves as a member of the board of directors of the following publicly traded companies: Williams-Sonoma, Inc. and Vroom, Inc. Mr. Dahnke is also a member of the board of directors of several private companies. Mr. Dahnke holds a B.S. in Mechanical Engineering from the University of Notre Dame and a M.B.A. from Harvard Business School. We believe that Mr. Dahnke is qualified to serve on our board of directors due to his experience in private equity investment and expertise in

the ecommerce, retail and consumer products industry, as well as his experience serving as a director of several companies.

**Defendant Gentile**

39.    Defendant Gentile has served as a Company director since May 4, 2021, the effective date of the Registration Statement. She served as Chair of the Audit Committee during the Relevant Period.

40.    According to the Prospectus, Defendant Gentile receives a $50,000 annual cash retainer for service as a non-employee director and a $20,000 annual cash retainer for service as Chair of the Audit Committee, in addition to certain grants of equity compensation.

41.    The Prospectus stated the following about Defendant Gentile:

**Susan Gentile** has served as a member of our board of directors since May 2021, effective upon the effectiveness of the registration statement of which this prospectus forms a part. Ms. Gentile is the Chief Financial and Administrative Officer at H.I.G. Capital Management, LLC. Prior to joining H.I.G. Capital Management in May 2018, Ms. Gentile served as Managing Director and Chief Accounting Officer at Oaktree Capital Management, a global alternative investment firm, from October 2013 to March 2018. Ms. Gentile also held various management roles at The Clorox Company from March 2006 to September 2013. Prior to joining The Clorox Company, Ms. Gentile served in roles at Levi Strauss & Co., Motorola, Inc. and Deloitte & Touche LLP. Ms. Gentile holds a B.S.B.A. in Finance from Boston University and is a Certified Public Accountant. We believe that Ms. Gentile is qualified to serve on our board of directors due to her financial expertise and experience working with consumer product brands.

**Defendant Liaw**

42.    Defendant Liaw has served as a Company director since November 2013. He served as a member of the Audit Committee and the Compensation Committee during the Relevant Period. Defendant Liaw is a General Partner of Institutional Venture Partners XIII, L.P., which sold 1,200,000 Company shares in the IPO for proceeds of $19.2 million and which beneficially owned 11.5% of the Company following the IPO.

43.     According to the Prospectus, Defendant Liaw receives a $50,000 annual cash retainer for service as a non-employee director, a $15,000 annual cash retainer for service as a member of the Audit Committee, and a $7,500 annual cash retainer for service as a member of the Compensation Committee, in addition to certain grants of equity compensation.

44.     The Prospectus stated the following about Defendant Liaw:

**Eric Liaw** has served as a member of our board of directors since November 2013. Since March 2011, Mr. Liaw has served in several roles at Institutional Venture Partners, a venture capital firm, where he currently serves as a General Partner. From August 2003 to January 2011, Mr. Liaw served in several roles at Technology Crossover Ventures, a venture capital firm, including most recently as a Vice President. Mr. Liaw serves on the boards of directors of a number of privately held companies. Mr. Liaw holds an A.B. in Economics, with a minor in Computer Science, and a M.S. in Management Science and Engineering from Stanford University. We believe that Mr. Liaw is qualified to serve on our board of directors due his financial and investment expertise, including his particular focus in the growth of startups in the internet retail space.

## Defendant Liew

45.     Defendant Liew has served as a Company director since September 2011. He served as a member of the Nominating and Corporate Governance Committee during the Relevant Period. According to a Form 4 filed by Defendant Liew with the SEC on May 10, 2021, Liew is a director of the general partner of the general partner of Lightspeed Venture Partners Select, L.P., which sold 82,648 shares of Company common stock on May 7, 2021 in connection with the IPO, for proceeds of $1,322,368. According to the Prospectus, and given that the underwriters fully exercised their option to purchase additional shares, Defendant Liew beneficially owned 529,108 shares of the Company after the IPO. Given that the price of the Company's common stock was $19.08 when markets closed on May 7, 2021, when the IPO was completed, Defendant Liew beneficially owned approximately $10.1 million worth of Honest stock.

46.     According to the Prospectus, Defendant Liew receives a $50,000 annual cash retainer for service as a non-employee director and a $5,000 annual cash retainer for service as a member of the Nominating and Corporate Governance Committee.

47.     The Prospectus stated the following about Defendant Liew:

**Jeremy Liew** has served as a member of our board of directors since September 2011. Since March 2006, Mr. Liew has served as a Partner at Lightspeed Venture Partners, a venture capital firm. Prior to joining Lightspeed, Mr. Liew served as a General Manager at Netscape from January 2004 to November 2005, as Senior Vice President of Corporate Development and Office of the Chairman at AOL from October 2002 to December 2003 and as VP Strategic Planning at Interactive Corp from June 1999 to October 2002. Prior to joining Interactive Corp, Mr. Liew served in roles at CitySearch and McKinsey & Co. Mr. Liew currently serves as a member of the board of directors of Affirm Holdings, Inc., a publicly traded company. Mr. Liew graduated with honors with a B.Sc. in Mathematics and a B.A. in Linguistics from the Australian National University, and with an M.B.A. from Stanford Business School. We believe that Mr. Liew is qualified to serve on our board of directors due to his extensive technology investment experience and his prior experience as an executive.

**Defendant Pramanik**

48.     Defendant Pramanik has served as a Company director since June 2018. He served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Pramanik is a Partner at *L* Catterton Partners, a consumer-focused private equity firm. THC Shared Abacus, LP, a fund affiliated with *L* Catterton Partners, sold 19,017,945 shares of Company common stock in the IPO for proceeds of $304,287,120.

49.     According to the Prospectus, Defendant Pramanik receives a $50,000 annual cash retainer for service as a non-employee director, a $7,500 annual cash retainer for service as a member of the Compensation Committee, and a $5,000 annual cash retainer for service as a member of the Nominating and Corporate Governance Committee.

50.     The Prospectus stated the following about Defendant Pramanik:

**Avik Pramanik** has served as a member of our board of directors since June 2018. Mr. Pramanik is a Partner at *L* Catterton, a consumer-focused private

equity firm. Prior to joining *L* Catterton in September 2011, Mr. Pramanik served as Director of Strategic Development at Alterna Haircare, a prestige branded haircare company, from January 2011 to June 2011, as an Associate at TSG Consumer Partners, a middle-market private equity firm, from July 2009 to June 2011, and as an Analyst at Goldman Sachs, where he worked in the Investment Banking Division's Consumer Products and Retail group and in the Principal Investment Area, from June 2006 to June 2009. Mr. Pramanik serves on the boards of directors of a number of privately held companies. Mr. Pramanik holds a B.S.B.A. in Finance from Georgetown University. We believe that Mr. Pramanik is qualified to serve on our board of directors due to his experience as an investor in high growth consumer product brands and knowledge of the beauty, personal care and specialty retail categories.

## **Defendant White**

51.     Defendant White has served as Chair of the Board since May 4, 2021, the effective date of the Registration Statement. In addition, he served as Chair of the Nominating and Corporate Governance Committee during the Relevant Period.

52.     According to the Prospectus, Defendant White receives a $50,000 annual cash retainer for his service as a non-employee director, a $125,000 annual cash retainer for his service as the non-executive Chair of the Board, and a $10,000 annual cash retainer for service as Chair of the Nominating and Corporate Governance Committee, in addition to certain grants of equity compensation.

53.     The Prospectus stated the following about Defendant White:

**James White** has served as Chair of our board of directors since May 2021, effective upon the effectiveness of the registration statement of which this prospectus forms a part. From 2008 to 2016, Mr. White served as the Chairman, President and Chief Executive Officer of Jamba Inc. Mr. White also served as Senior Vice President and General Manager of Safeway, Inc., a U.S. supermarket chain, from 2005 to 2008. From 1983 to 2005, Mr. White held management roles at The Gillette Company, Inc., Nestlé S.A. and The Coca-Cola Company. Additionally, Mr. White currently serves on the board of directors of the following public companies: Affirm Holdings Inc., Medallia, Inc., The Simply Good Foods Company and Adtalem Global Education Inc. Mr. White previously served on the board of directors of Panera Bread Company, Schnucks Markets, Inc., Bradshaw Home, Inc., Callidus Software Inc., Daymon Worldwide, Inc., Hillshire Brands Company and Keane Inc. Mr. White's non-profit board experience includes Directors

Academy, where he is a founding member and previously served as Board Chairman, as well as Board Chairman for Fair Trade USA. Mr. White previously served on the non-profit boards of the Nasdaq Entrepreneurial Center, The Organic Center and the Network of Executive Women. Mr. White received a B.S. degree, with a major in marketing, from The University of Missouri and an M.B.A. from Fontbonne University. Mr. White is also a graduate of the Cornell University Food Executive Program and was a Stanford University Distinguished Careers Institute Fellow in 2018. We believe that Mr. White is qualified to serve on our board of directors due to his experience as a public company director and his experience as a consumer products executive.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54.     By reason of their positions as officers, directors, and/or fiduciaries of Honest and because of their ability to control the business and corporate affairs of Honest, the Individual Defendants owed Honest and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Honest in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Honest and its shareholders so as to benefit all shareholders equally.

55.     Each director and officer of the Company owes to Honest and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Honest, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.     To discharge their duties, the officers, and directors of Honest were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty,

good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Honest, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Honest's Board at all relevant times.

59.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

60.    To discharge their duties, the officers and directors of Honest were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Honest were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Honest's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Honest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Honest and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Honest's operations would comply with all applicable laws and Honest's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and

accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.    Each of the Individual Defendants further owed to Honest and the shareholders the duty of loyalty requiring that each favor Honest's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Honest and were at all times acting within the course and scope of such agency.

63.    Because of their advisory, executive, managerial, directorial, and controlling positions with Honest, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

64.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Honest.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to engaged in the Stockpiling Misconduct and to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse

information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

67.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to engage in the Stockpiling Misconduct, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Honest was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

69.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Honest, and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Code of Conduct

70.     Honest's Code of Conduct states that the Company "is committed to maintaining the highest standards of business conduct and ethics." The Code of Conduct further provides that it "reflects the business practices and principles of behavior that support this commitment."

71.     The Code of Conduct states that it applies to all employees, officers and directors:

> We expect every employee, officer and director to not only read and understand the business practices and principles described below, but to also apply good judgment and the highest personal ethical standards in making business decisions. Please remember you should consider not only your own conduct, but also that of your family members, significant others and other people in your household. References in the Code to employees are intended to cover officers and, as applicable, directors.

72.     In section titled "Honest and Ethical Conduct," the Code of Conduct provides as follows:

> It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The Company's integrity and reputation depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity and sound judgment is the foundation of corporate integrity.

73.     In a section titled "Legal Compliance," the Code of Conduct provides as follows:

> Obeying the law is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer.
>
> Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties.

74.     In a section titled "Conflicts of Interest," the Code of Conduct provides as follows, in relevant part:

> We expect our employees, officers and directors to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even just the appearance of a conflict of interest can be damaging and should be avoided.

75.     In a section titled "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Conduct provides as follows regarding the integrity of records and public disclosure:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:
>
> - no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
> - transactions be supported by appropriate documentation;
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
> - employees comply with our system of internal controls; and
> - no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

76.     In the same section, the Code of Conduct provides as follows regarding the use of accounting records for the production of reports:

> Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and

finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance and Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

77.    In a section titled "Company Assets," the Code of Conduct provides as follows:

All employees, officers and directors are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability. Our property, such as office supplies, computer equipment, buildings and products, are expected to be used only for legitimate business purposes, although incidental personal use may be permitted. You may not, however, use our corporate name, any brand name or trademark owned or associated with the Company or any letterhead stationery for any personal purpose.

### Audit Committee Charter

78.    The Company's Audit Committee Charter provides that the purpose of the Audit Committee is to:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- manage the selection, engagement terms, fees, qualifications, independence and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "**Auditors**");

- maintain and foster an open avenue of communication with the Company's management, internal audit group (if any) and Auditors;
- review any reports or disclosures required by applicable law and listing requirements of the Nasdaq Stock Market (the "***Exchange***");
- oversee the design, implementation, organization and performance of the Company's internal audit function (if any);
- review and approve revisions to the Company's Investment Policy;
- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and
- provide regular reports and information to the Board.

79.   The Audit Committee Charter provides that the Audit Committee's responsibilities include the review of audited financial statements, including quarterly and annual reports. Specifically, the Audit Committee Charter provides as follows:

> The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

80.   The Audit Committee Charter further provides that the Audit Committee's responsibilities include the review of earnings announcements, as follows:

> The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

81.   In a section titled "Internal Control and Procedures," the Audit Committee Charter provides that the Audit Committee's responsibilities include risk assessment and management:

> The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security and cybersecurity, competition and regulation. Areas of focus for the Committee

shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee will review and discuss with management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

82.     In a section titled "Internal Auditors," the Audit Committee Charter reveals that *the Company has no internal audit function*, and provides that review of any future internal audit function will be the responsibility of the Audit Committee, as follows:

*The Company does not currently have an Internal Audit function.* If an internal audit function is established and becomes operational, the Committee will review the audit plan of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing and general audit approach. The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Committee.

(Emphasis added.)

83.     In a section titled "Internal Control over Financial Reporting; Disclosure Controls," the Audit Committee Charter provides as follows:

The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

84.     In violation of the Code of Conduct, the Audit Committee Charter, and the Company's corporate governance documents, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty,

unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof. Also in violation of the Company's corporate governance documents, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Furthermore, the Individual Defendants failed to maintain internal controls, including by failing to establish an internal audit function.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

85.    Honest is a consumer products company with its principal executive offices in Los Angeles. The Company describes itself as "a digitally-native, mission-driven brand focused on leading the clean lifestyle movement, creating a community for conscious consumers and seeking to disrupt multiple consumer product categories."

86.    The Company's three product categories are Diapers and Wipes, Skin and Personal Care, and Household and Wellness, which represented 63%, 26% and 11% of our 2020 revenue, respectively.

87.    Due to the COVID-19 pandemic, the Company experienced increased demand for its sanitization products. In response to this demand, the Company accelerated the development timeline for certain product launches, and it launched new disinfecting spray and alcohol wipe products in 2020.

88.    Despite widespread news coverage of consumer stockpiling behavior in 2020,[2] and despite knowing that the related surge of demand for the Company's products would lead to consumers and customers stockpiling its products, the Individual Defendants caused the Company to engage in the Stockpiling Misconduct.

---

[2] https://www.washingtonpost.com/national/coronavirus-toilet-paper-shortage-panic/2020/04/07/1fd30e92-75b5-11ea-87da-77a8136c1a6d_story.html (last visited November 23, 2021).

Verified Shareholder Derivative Complaint

89.     Moreover, the Individual Defendants made or caused the Company to make false and misleading statements concerning the Stockpiling Misconduct, consumer stock-up purchases, and the effects of the foregoing on the Company's financial prospects and health.

**Stockpiling Misconduct**

90.     The COVID-19 pandemic has had far-reaching consequences across the globe, including by killing millions, severely affecting many others, and disrupting a wide swath of economic activity.

91.     The onset of the pandemic led to significant "panic buying," in which consumers would stockpile goods, including food and personal care items.[3] Pandemic-fueled panic buying has extended to products related to containment or mitigation of COVID-19.[4]

92.     To protect against SARS CoV-2, the virus that causes COVID-19, the U.S. Environmental Protection Agency has recommended that the public engage in "surface cleaning" as one component of a larger strategy to contain the virus, which is spread via airborne particles and droplets.[5]

93.     In response to increased demand for sanitization products, Honest accelerated its development timeline for certain product launches, launching a disinfecting spray and alcohol wipes in 2020.

94.     The Company's products became subject to stock-up behaviors. During the three months ended June 30, 2020, the Company experienced an estimated $3.7 million COVID-19 stock-up impact primarily in its Diapers and Wipes product category.

---

[3] https://www.bbc.com/worklife/article/20200304-coronavirus-covid-19-update-why-people-are-stockpiling (last visited November 23, 2021).

[4] https://www.bloomberg.com/news/articles/2020-03-04/-hamster-buying-depletes-supermarket-shelves-on-virus-fears (last visited November 23, 2021).

[5] https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19 (last visited November 23, 2021).

Verified Shareholder Derivative Complaint

95.     Consumer and retail stockpiling caused a significant near-term surge in demand for the Company's products, which would necessarily lessen future demand for the Company's products. Nevertheless, the Company engaged in the Stockpiling Misconduct in anticipation of future **growth**. Specifically, and as disclosed in filings with the SEC, the Company has "taken measures to bolster key aspects of its supply chain, such as . . . ***ensuring sufficient inventory to support our continued growth in the face of the pandemic.***" (Emphasis added.)

96.     The Stockpiling Misconduct resulted in the Company experiencing a $5.7 million increase in inventory for the six months ended June 30, 2020, which the Company attributed to the "timing of inventory purchases."

97.     While the Individual Defendants were causing the Company to engage in the Stockpiling Misconduct, consumer demand for sanitizing and disinfecting products was decelerating.

### **2021 Dividend**

98.     While demand for the Company's products was decelerating and the Company was engaging in the Stockpiling Misconduct, the Board approved a massive payout to insiders prior to the Company going public.

99.     Specifically, in April 2021, the Board declared a cash dividend of $35 million to the holders of record of the Company's common stock and its redeemable convertible preferred stock as of May 3, 2021, contingent upon the closing of the IPO and payable no later than June 30, 2021 (the "2021 Dividend"). Defendants Bayne, Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren served as Company directors when the Board approved the 2021 Dividend.

100.    According to the Prospectus, the following amounts were payable to the following related parties pursuant to the 2021 Dividend:

(a) $13,108,764 to THC Shared Abacus, LP, a fund which beneficially owned 37.1% of the Company before the IPO and 13.5% of the Company following

the IPO and which is affiliated with *L* Catterton Partners, of which Defendant Dahnke is co-CEO and Defendant Pramanik is a partner;

(b) $4,853,915 to Institutional Venture Partners XIII, L.P., which beneficially owned 13.8% of the Company before the IPO and 11.5% of the Company following the IPO and of which Defendant Liaw is a General Partner;

(c) $4,293,952 to entities affiliated with Lightspeed Venture Partners— Defendant Liew is a director of Lightspeed Ultimate General Partner Select, Ltd., the general partner of the general partner of Lightspeed Venture Partners Select, L.P.;

(d) $3,242,899 to entities affiliated with Fidelity, which beneficially owned 12.2% of the Company before the IPO and 8.7% afterward;

(e) $2,633,660 to entities affiliated with Defendant Warren, who beneficially owned 6.6% of the Company before the IPO and 6.2% afterward;

(f) $1,781,494 to entities affiliated with General Catalyst, which beneficially owned 9.4% of the Company before the IPO and 8.7% afterwards; and

(g) $35,107 to Nikolaos and Angela Vlahos 2006 Trust, over which Defendant Vlahos and his wife share voting and investment power as trustees.

101.    Thus, Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren used their positions as members of the Board to cause the Company to pay handsome dividends to themselves or to their affiliated entities.

102.    The 2021 Dividend totaling $35 million, of which $20.6 million was paid to holders of the Company's redeemable convertible preferred stock, was paid on June 29, 2021, or during the Company's fiscal quarter ended June 30, 2021. During the same fiscal quarter, the Company reported net loss of $20 million.

**May 2021 IPO**

103.    In early 2021, the Individual Defendants began taking steps to take Honest public. On January 29, 2021, the Company filed a draft registration statement on Form

DRS with the SEC. On April 9, 2021, the Company filed its Form S-1, which was subsequently amended. On April 26, 2021, the Company filed with the SEC its final amendment to the Form S-1 on Form S-1/A. On May 4, 2021, the SEC declared the Registration Statement effective. The Company then filed the Prospectus on May 6, 2021.

104.   The Company's stock began trading publicly on May 5, 2021. Through the IPO, the Company sold 6,451,613 shares and certain existing stockholders sold an aggregate of 19,355,387 shares, for a total offering of 25,807,000 shares. The IPO's underwriters would also fully exercise their options to purchase an additional 3,871,050 from the selling stockholders, within thirty days of the IPO. The Company received aggregate net proceeds of approximately $91.1 million after deducting underwriting discounts and commissions, as well as other offering expenses. According to the Prospectus, the net proceeds received from the IPO were to be used for "general corporate purposes," which "include operating expenses, working capital and capital expenditures for future growth, including marketing and direct-to-consumer advertising investments, innovation and adjacent product category expansion, international growth investment and organizational capabilities investments." The Prospectus also asserted that: "We may also use a portion of the net proceeds to acquire complementary businesses, products, services or technologies."

105.   The IPO, which netted the Company $91.1 million in proceeds, was complete on May 7, 2021.

106.   On June 29, 2021, the Company paid the 2021 Dividend in the amount of $35 million to holders of the Company's common stock and redeemable convertible preferred stock as of May 3, 2021, or just days prior to the IPO.

**Disclosure Requirements**

107.   SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Honest, with respect to their finances and operations. Specifically, Item 303(b)(2)(i) required Honest to:

Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

108.   Item 303(b)(2)(ii) required Honest to:

Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

109.   Additionally, Item 105 of Regulation S-K required the Individual Defendants to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."

110.   Even after the IPO was effectuated, the Individual Defendants had a duty to disclose pursuant to Item 303 of Regulation S-K, which requires that all Form 10-Qs and 10-Ks filed with the SEC include a section on "[m]anagement's discussion and analysis of financial condition and results of operations" that includes, *inter alia*: (1) "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations," (2) "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," (3) "descriptions and amounts of matters that have had a material impact on reported operations," and (4) "matters that are reasonably likely based on management's assessment to have a material impact on future operations."

111.   Therefore, the Individual Defendants had a duty throughout the Relevant Period to cause the Company to disclose all material facts related to: (1) stockpiling of the Company's products; (2) the Company's engagement in the Stockpiling Misconduct; (3)

deceleration of demand for the Company's products; (4) impacts of the foregoing on the Company's financial results; and (5) the Company's failure to maintain adequate internal controls.

**False and Misleading Statements Made in Connection with the IPO**

112.   The Registration Statement stated the following regarding the Company's past performance and financial results:

As we have executed against our Innovation Strategy, we have been successful in reinvigorating growth, improving product mix, significantly enhancing our gross margin profile and turning profitable on an adjusted EBITDA basis. We have achieved the following financial results:

- From 2018 to 2020, we grew revenue by a 12% compound annual growth rate, or CAGR, from $237.9 million to $300.5 million, with only a slight decline in 2019 as we offset declines from Non-Core Products;
- We achieved 27.6% year-over-year revenue growth in 2020, recording year-over-year revenue growth rates of 16.4%, 35.5%, and 116.5% in our Diapers and Wipes, Skin and Personal Care and Household and Wellness categories, respectively;
- We also increased gross margin by 1,080 basis points from 25.1% in 2018 to 35.9% in 2020, by driving growth in higher-margin products and channels, leveraging our strategic relationships with retailers, gaining leverage on fixed costs in fulfillment, as well as executing on accretive product innovation; and
- In 2020, we reported a net loss of $14.5 million and adjusted EBITDA of $11.2 million, or 4% of revenue.

113.   The Registration Statement also stated the following regarding macro-level consumer trends: "[c]hanges in macro-level consumer spending trends, including as a result of the COVID-19 pandemic, **could** result in fluctuations in our operating results." (Emphasis added.)

114.   The Registration Statement also stated the following regarding the impact of COVID-19:

The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition,

results of operations and prospects will depend on future developments that are uncertain.

As a result of the COVID-19 pandemic, we temporarily closed our headquarters, supported our employees and contractors to work remotely, and implemented travel restrictions. These actions represented a significant change in how we operated our business, but we believe that we successfully navigated this transition. In an effort to provide a safe work environment for our employees, we have implemented various social distancing measures, including replacing in-person meetings with virtual interactions. We will continue to take actions as may be required or recommended by government authorities or as we determine are in the best interests of our employees and other business partners in light of the pandemic.

We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, none of which has materially impacted our ability to service our consumers and retail and third-party ecommerce customers. *We have taken measures to bolster key aspects of our supply chain, such as securing secondary suppliers and ensuring sufficient inventory to support our continued growth in the face of the pandemic.* We continue to work with our existing manufacturing, logistics and other supply chain partners to ensure our ability to service our consumers and retail and third-party ecommerce customers.

*We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers have shifted to online shopping amid the pandemic. Additionally, our Household and Wellness product category has benefitted from increasing demand for sanitization products. We accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020. There is no assurance that we will continue to experience such increases in demand.* We may see a decline in use of online shopping and demand for sanitization products when the COVID-19 pandemic subsides.

The operations of our retail partners, manufacturers and suppliers have also been impacted by the COVID-19 pandemic. While the duration and extent of the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, it has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic may negatively impact collections of accounts

receivable and reduce expected spending from new consumers, all of which could adversely affect our business, financial condition, results of operations and prospects during fiscal 2021 and potentially future periods.

(Emphasis added.)

115.   The Registration Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's financial results were significantly impacted by stockpiling of the Company's products; (2) despite the negative implications of consumer and customer stockpiling behavior on the Company's future sales, the Company engaged in the Stockpiling Misconduct to support growth that was not reasonably likely to materialize; (3) the Company was experiencing decelerating demand for its products; (4) as a result of the foregoing, the Company's financial results were likely to be adversely impacted; and (5) the Company failed to maintain adequate internal controls.

## **False and Misleading Statements Made During the Relevant Period**

### *May 6, 2021 Prospectus*

116.   On May 6, 2021, the Company filed the Prospectus with the SEC. The Prospectus stated the following regarding the Company's past performance and financial results:

As we have executed against our Innovation Strategy, we have been successful in reinvigorating growth, improving product mix, significantly enhancing our gross margin profile and turning profitable on an adjusted EBITDA basis. We have achieved the following financial results:
- From 2018 to 2020, we grew revenue by a 12% compound annual growth rate, or CAGR, from $237.9 million to $300.5 million, with only a slight decline in 2019 as we offset declines from Non-Core Products;
- We achieved 27.6% year-over-year revenue growth in 2020, recording year-over-year revenue growth rates of 16.4%, 35.5%, and 116.5% in our Diapers and Wipes, Skin and Personal Care and Household and Wellness categories, respectively;
- We also increased gross margin by 1,080 basis points from 25.1% in 2018 to 35.9% in 2020, by driving growth in higher-margin products and

channels, leveraging our strategic relationships with retailers, gaining leverage on fixed costs in fulfillment, as well as executing on accretive product innovation; and

• In 2020, we reported a net loss of $14.5 million and adjusted EBITDA of $11.2 million, or 4% of revenue.

117.   The Prospectus also stated the following regarding macro-level consumer trends: "[c]hanges in macro-level consumer spending trends, including as a result of the COVID-19 pandemic, ***could*** result in fluctuations in our operating results." (Emphasis added.)

118.   The Prospectus also stated the following regarding the impact of COVID-19:
The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.

As a result of the COVID-19 pandemic, we temporarily closed our headquarters, supported our employees and contractors to work remotely, and implemented travel restrictions. These actions represented a significant change in how we operated our business, but we believe that we successfully navigated this transition. In an effort to provide a safe work environment for our employees, we have implemented various social distancing measures, including replacing in-person meetings with virtual interactions. We will continue to take actions as may be required or recommended by government authorities or as we determine are in the best interests of our employees and other business partners in light of the pandemic.

We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, none of which has materially impacted our ability to service our consumers and retail and third-party ecommerce customers. ***We have taken measures to bolster key aspects of our supply chain, such as securing secondary suppliers and ensuring sufficient inventory to support our continued growth in the face of the pandemic.*** We continue to work with our existing manufacturing, logistics and other supply chain partners to ensure our ability to service our consumers and retail and third-party ecommerce customers.

*We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers have shifted to online shopping amid the pandemic. Additionally, our Household and Wellness product category has benefitted from increasing demand for sanitization products. We accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020. There is no assurance that we will continue to experience such increases in demand.* We may see a decline in use of online shopping and demand for sanitization products when the COVID-19 pandemic subsides.

The operations of our retail partners, manufacturers and suppliers have also been impacted by the COVID-19 pandemic. While the duration and extent of the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, it has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic may negatively impact collections of accounts receivable and reduce expected spending from new consumers, all of which could adversely affect our business, financial condition, results of operations and prospects during fiscal 2021 and potentially future periods.

(Emphasis added.)

### June 17, 2021 Quarterly Report

119.   On June 17, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2021 (the "1Q21 10-Q"). It was signed by Defendants Vlahos and Kennedy and contained certifications signed by Defendants Vlahos and Kennedy pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

120.   The 1Q21 10-Q stated the following regarding macro-level consumer trends: "[c]hanges in macro-level consumer spending trends, including as a result of the COVID-19 pandemic, could result in fluctuations in our operating results."

121.   The 1Q21 10-Q also stated the following regarding the impact of COVID-19:

The COVID-19 pandemic has caused general business disruption worldwide beginning in January 2020. The full extent to which the COVID-19 pandemic will directly or indirectly impact our cash flow, business, financial condition, results of operations and prospects will depend on future developments that are uncertain.

As a result of the COVID-19 pandemic, our headquarters is temporarily closed as we support our employees and contractors to work remotely. We have also implemented travel restrictions. These actions represent a significant change in how we operate our business, but we believe that we successfully navigated this transition. In an effort to provide a safe work environment for our employees, we have implemented various social distancing measures, including replacing many in-person meetings with virtual interactions. We will continue to take actions as may be required or recommended by government or health authorities or as we determine are in the best interests of our employees and other business partners in light of the pandemic.

We have experienced relatively minor impacts on our inventory availability and delivery capacity since the outbreak, none of which has materially impacted our ability to service our consumers and retail and third-party ecommerce customers. ***We have taken measures to bolster key aspects of our supply chain, such as securing secondary suppliers and ensuring sufficient inventory to support our continued growth in the face of the pandemic. We continue to work with our existing manufacturing, logistics and other supply chain partners to ensure our ability to service our consumers and retail and third-party ecommerce customers.***

***We believe COVID-19 has been one of the drivers of demand in our Digital channel as consumers shifted to online shopping amid the pandemic. Additionally, our Household and Wellness product category has benefited from increasing demand for sanitization products. We accelerated our development timeline for certain product launches, launching our disinfecting spray and alcohol wipes in 2020. We have seen increased consumer willingness to return to in-store shopping as the economy opens and more of the population is vaccinated. This has driven a channel shift and demand acceleration driving revenue growth within our Retail channel in 2021.***

The operations of our retail partners, manufacturers and suppliers have also been impacted by the COVID-19 pandemic. While the duration and extent of

the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, it has already had an adverse effect on the global economy and the ultimate societal and economic impact of the COVID-19 pandemic remains unknown. In particular, the conditions caused by this pandemic may negatively impact collections of accounts receivable and reduce expected spending from new consumers, all of which could adversely affect our business, financial condition, results of operations and prospects during fiscal 2021 and potentially future periods.

(Emphasis added.)

122.   The 1Q21 10-Q stated the following regarding the Company's evaluation of disclosure controls and procedures:

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, that are designed to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure. Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the period ended March 31, 2021, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). ***Based on that evaluation, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.***

(Emphasis added.)

123.   The 1Q21 10-Q also stated the following regarding limitations on effectiveness of controls and procedures:

In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

124.    The Prospectus and 1Q21 10-Q were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's financial results were significantly impacted by stockpiling of the Company's products; (2) despite the negative implications of consumer and customer stockpiling behavior on the Company's future sales, the Company engaged in the Stockpiling Misconduct to support growth that was not reasonably likely to materialize; (3) the Company was experiencing decelerating demand for its products; (4) as a result of the foregoing, the Company's financial results were likely to be adversely impacted; and (5) the Company failed to maintain adequate internal controls. As a result, Honest's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

125.    The truth emerged August 13, 2021 before the market opened, when the Company issued a press release reporting financial results for the fiscal quarter and the six-month period ended June 30, 2021.

126.    In the press release, the Company reported a net loss of $20 million for the second quarter of 2021, compared to net loss of $0.4 million during the second quarter of 2020. The Company reported that revenue growth in the second quarter of 2021 was only $2.2 million, or 3%. It also reported that revenue in the Diapers and Wipes product category declined 2% as compared to the second quarter of 2020.

127.    With respect to the Household and Wellness revenue, the Company disclosed that "revenue declined 6% from the second quarter of 2020 as consumer and customer demand for sanitization products decreased as consumers became vaccinated and customers managed heavy levels of inventory." Furthermore, the Company stated that "Household and Wellness [revenue] declined 31% as compared to the second quarter of 2019 as we simplified the product portfolio while discontinuing certain non-core products that did not align with our revamped product strategy."

128.   The press release stated as follows, in relevant part:

LOS ANGELES, Aug. 13, 2021 (GLOBE NEWSWIRE) -- The Honest Company (NASDAQ: HNST), a digitally native, mission-driven brand focused on leading the clean lifestyle movement, reported second quarter 2021 financial results for the three and six months ended June 30, 2021.

"The underlying strength and financial performance of our overall business for the first half of 2021 reflects the ongoing success of our strategic initiatives focused on Content, Community, Commerce, and our powerful innovation and category expansion," said Nick Vlahos, Chief Executive Officer of The Honest Company. "For the first half of 2021, we were pleased to deliver 8% revenue and volume growth on top of the accelerated COVID stock-up surge of 25% revenue growth that we saw in the first half of 2020 as compared to the first half of 2019. We also exceeded our gross margin expectations for the overall business in the first half of 2021, showing the strength of our business at a time when our entire industry faced a challenging input cost, inventory and supply chain environment."

Vlahos continued, "During the second quarter we saw positive consumer response to our new Clean Conscious Diaper and marketing innovation with over 17% retail consumption growth for Honest's Diapers, Wipes and Personal Care products as measured by syndicated data for the thirteen-weeks ended June 27, 2021. This growth is on top of the significant COVID-19 stock-up we experienced in the Diapers and Wipes category in 2020. As we look to the remainder of the year, we continue to have confidence in our three year strategic plan, Strategy 2023, and are focused on executing with excellence to deliver shareholder value over the long-term and solidify Honest's position as the next generation, modern CPG company."

**Second Quarter Highlights**
- **Revenue** grew 3% from the second quarter of 2020; excluding an estimated $3.7 million COVID-19 stock-up impact primarily in Diapers and Wipes in the prior year period, revenue growth was 9%[]:
  - ***Skin and Personal Care*** revenue increased 16% from the second quarter of 2020 and increased 39% as compared to the second quarter of 2019.
  - ***Diapers and Wipes*** declined 2% as compared to the second quarter of 2020 with mid-single digit growth in diapers offset by the 2020 COVID-19 stock-up impact in the prior year period. Diapers and Wipes grew 17% as compared to the second quarter of 2019.

- o ***Household and Wellness*** revenue declined 6% from the second quarter of 2020 as consumer and customer demand for sanitization products decreased as consumers became vaccinated and customers managed heavy levels of inventory. Household and Wellness declined 31% as compared to the second quarter of 2019 as we simplified the product portfolio while discontinuing certain non-core products that did not align with our revamped product strategy.

- **Gross margin** was 36% representing a decrease of 50 basis points from the second quarter of 2020 and expansion of 710 basis points from the second quarter of 2019; notably, gross margin expanded 110 basis points from the first quarter of 2021; the gross margin decline from the second quarter of 2020 was driven by more normalized levels of trade spend; the expansion in gross margin versus the second quarter of 2019 and the first quarter of 2021 was driven in part by our cost savings and product mix initiatives

- **Net loss** was $20.0 million (including one-time IPO related costs and other transaction-related expenses) and **adjusted EBITDA** was a loss of $0.8 million for the second quarter of 2021

129.   On this news, the Company's share price fell $3.98, or 28%, to close at $10.07 per share on August 13, 2021. On August 19, 2021, the Company's share price closed at an $9.16 per share. Thus, the Company's stock price declined nearly 43% from the IPO price per share of $16.00.

## DAMAGES TO HONEST

130.   As a direct and proximate result of the Individual Defendants' misconduct, Honest has lost and will continue to lose and expend many millions of dollars.

131.   Such expenditures include, but are not limited to, fees associated with the Securities Class Actions filed against the Company and the Class Action Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

132.   Such expenditures further include the costs associated with the Stockpiling Misconduct, including but not limited to costs associated with the Company's $5.7 million increase in inventory for the six months ended June 30, 2021.

133.    Such expenditures further include payments on or around June 29, 2021 under the 2021 Dividend, which totaled $35 million, and of which approximately $25 million went to entities affiliated with Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren.

134.    Such expenditures further include bonuses paid related to preparation for the IPO that triggered upon the closing of the IPO.

135.    Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

136.    As a direct and proximate result of the Individual Defendants' conduct, Honest has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

137.    Plaintiff brings this action derivatively and for the benefit of Honest to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Honest, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for contribution under Section 11(f) of the Securities Act and 21D of the Exchange Act.

138.    Honest is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139.    Plaintiff is, and has been at all relevant times, a shareholder of Honest. Plaintiff will adequately and fairly represent the interests of Honest in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

Verified Shareholder Derivative Complaint

## DEMAND FUTILITY ALLEGATIONS

140.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

141.   A pre-suit demand on the Board of Honest is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Vlahos, Bayne, Dahnke, Gentile, Liaw, Liew, Pramanik, Warren, and White (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

142.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to engage in the Stockpiling Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

143.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct. Throughout the Relevant Period, the Directors failed to correct the false and misleading statements, despite their affirmative obligation to do so. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls, and failed to establish an internal audit function. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144.   Additional reasons that demand on Defendant Vlahos is futile follow. Defendant Vlahos has served as the Company's CEO and as a Company director since March 2017. Thus, as the Company admits, he is a non-independent director. As CEO

during the Relevant Period, Defendant Vlahos was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those contained in the 1Q21 10-Q, which he personally signed and for which he signed SOX certifications. Moreover, Defendant Vlahos signed, and thus personally made, the false and misleading statements contained in the Registration Statement. As CEO, the Company provides Defendant Vlahos with his principal occupation for which he receives handsome compensation, including a base salary of $825,000 in 2021. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. Moreover, Defendant Vlahos is named as a defendant in the Securities Class Actions. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Vlahos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.   Additional reasons that demand on Defendant Bayne is futile follow. Defendant Bayne has served as a Company director since October 2018, and was Chair of the Compensation Committee and a member of the Audit Committee during the Relevant Period. She receives significant compensation from the Company for her services on the Board and its committees. Defendant Bayne signed, and thus personally made, the false and misleading statements contained in the Registration Statement. In addition, Defendant Bayne is a Senior Advisor of Guggenheim Securities. Guggenheim Securities, LLC served as an underwriter for the IPO and is named as a defendant in one of the Securities Class

Actions. Thus, due to her employment by an entity involved in the misconduct, Defendant Bayne is precluded from acting independently and in the best interests of the Company and its shareholders, as any action she might take to investigate the misconduct could implicate her employer, posing a risk to her continued employment with the same. As a trusted Company director, Defendant Bayne conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, she failed to correct the false and misleading statements throughout the Relevant Period. For these reasons, Defendant Bayne breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Dahnke is futile follow. Defendant Dahnke has served as a Company director since June 2018. He receives significant compensation from the Company for his service on the Board. Moreover, Defendant Dahnke is one of two members of a managing board of the general partner of THC Shared Abacus, LP, which sold 19,017,945 shares of the Company's Common stock on May 7, 2021 at a price of $16 per share, for proceeds of $304,287,120. Thus, Defendant Liew directly benefitted from the scheme described herein, which was intended to make the Company appear more profitable and attractive to investors, including around the time of the IPO. Defendant Dahnke signed, and thus personally made, the false and misleading statements contained in the Registration Statement. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, he failed to correct the false and misleading statements throughout the Relevant Period. For these

reasons, Defendant Dahnke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Gentile is futile follow. Defendant Gentile has served as a Company since May 4, 2021, and she served as Chair of the Audit Committee during the Relevant Period. Defendant Gentile is entitled to significant compensation for her role at the Company. As a trusted director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, she failed to correct the false and misleading statements throughout the Relevant Period. For these reasons, Defendant Gentile breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Liaw is futile follow. Defendant Liaw has served as a Company director since November 2013. He served as a member of the Audit Committee and the Compensation Committee during the Relevant Period. Defendant Liaw is a General Partner of Institutional Venture Partners XIII, L.P., which sold 1,200,000 Company shares in the IPO for proceeds of $19.2 million and which beneficially owned 11.5% of the Company following the IPO. Defendant Liaw is entitled to significant compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, he failed to correct the false and misleading statements throughout the Relevant

Period. For these reasons, Defendant Liaw breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.   Additional reasons that demand on Defendant Liew is futile follow. Defendant Liew has served as a Company director since September 2011. He served as a member of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Liew is entitled to significant compensation for his role at the Company. In addition, Defendant Liew is a director of the general partner of the general partner of Lightspeed Venture Partners Select, L.P., which sold 82,648 shares of Company common stock on May 7, 2021 in connection with the IPO, for proceeds of $1,322,368. Thus, Defendant Liew benefitted from the scheme described herein, which was intended to make the Company appear more profitable and attractive to investors, including around the time of the IPO. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, he failed to correct the false and misleading statements throughout the Relevant Period. For these reasons, Defendant Liew breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.   Additional reasons that demand on Defendant Pramanik is futile follow. Defendant Pramanik has served as a Company director since June 2018. He served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Pramanik is entitled to significant compensation for his role at the Company. Defendant Pramanik is a Partner at *L* Catterton, a consumer-focused private equity firm that is affiliated with THC Shared Abacus, LP, a fund which sold 19,017,945 shares of Company common stock in the IPO for proceeds of

$304,287,120. As a trusted Company director, Defendant Pramanik conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, he failed to correct the false and misleading statements throughout the Relevant Period. For these reasons, Defendant Pramanik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151. Additional reasons that demand on Defendant Warren is futile follow. Defendant Warren founded the Company in 2011. She currently serves as CCO and as a director, and was formerly Chair of the Board. Defendant Warren is entitled to significant compensation for her role at the Company, including a base salary of $600,000. Thus, as the Company admits, she is a non-independent director. As founder and director of the Company, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, she failed to correct the false and misleading statements throughout the Relevant Period. For these reasons, Defendant Warren breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

152. Additional reasons that demand on Defendant White is futile follow. Defendant White has served as Chair of the Board since May 4, 2021. In addition, he served as Chair of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant White is entitled to significant compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the

scheme to cause the Company to make false and misleading statements and to engage in the Stockpiling Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, he failed to correct the false and misleading statements throughout the Relevant Period. For these reasons, Defendant White breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on the Board is futile follow.

154. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Pramanik is a partner and Defendant Dahnke is co-CEO of *L* Catterton Partners. THC Shared Abacus, LP, which sold $304,287,120 of Company common stock in the IPO and which beneficially owned 13.5% of the Company following the IPO, is a fund affiliated with *L* Catterton Partners. Due to their business relationships through *L* Catterton Partners and its affiliate, Defendants Pramanik and Dahnke are unlikely to investigate one another or any other individuals or entities that sold Company common stock in connection with the IPO. In addition, two of the Directors worked in senior positions at The Clorox Company ("Clorox"). Defendant Gentile held various management roles at Clorox from March 2006 to September 2013, including Vice President – Controller & Chief Accounting Officer. Defendant Vlahos joined Clorox in 1995 and held numerous roles within that company before serving at subsidiaries of Clorox and then again at Clorox. Specifically, Vlahos served as Vice President – General Manager, Burt's Bees from April 2011 to February 2013 and Vice President – General Manager, Laundry, Brita and Green Works from March 2009 to February 2011. Vlahos later served as Executive Vice President and Chief Operating Officer – Household, Lifestyle and Core Global Functions of Clorox. These conflicts of interest precluded the Directors from adequately monitoring the

Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

155.   In April 2021, prior to the IPO, the Board declared the 2021 Dividend, a cash dividend of $35 million to the holders of record of its common stock and redeemable convertible preferred stock as of May 3, 2021. The 2021 Dividend was paid on June 29, 2021, with $20.6 million of the total being paid to holders of the Company's redeemable convertible preferred stock. Defendants Bayne, Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren served as Company directors when the Board approved the 2021 Dividend. According to the Prospectus, the following amounts were payable to the following related parties pursuant to the 2021 Dividend: (1) $13,108,764 to THC Shared Abacus, LP, a fund which beneficially owned 37.1% of the Company before the IPO and 13.5% of the Company following the IPO and which is affiliated with *L* Catterton Partners, of which Defendant Dahnke is co-CEO and Defendant Pramanik is a partner; (2) $4,853,915 to Institutional Venture Partners XIII, L.P., which beneficially owned 13.8% of the Company before the IPO and 11.5% of the Company following the IPO and of which Defendant Liaw is a General Partner; (3) $4,293,952 to entities affiliated with Lightspeed Venture Partners—Defendant Liew is a director of the general partner of the general partner of Lightspeed Venture Partners Select, L.P.; (4) $3,242,899 to entities affiliated with Fidelity, which owned 12.2% of the Company before the IPO and 8.7% afterward; (5) $2,633,660 to entities affiliated with Defendant Warren, who owned 6.6% of the Company before the IPO and 6.2% afterward; (6) $1,781,494 to entities affiliated with General Catalyst, which which owned 9.4% of the Company before the IPO and 8.7% afterwards; and (7) $35,107 to Nikolaos and Angela Vlahos 2006 Trust, over which Defendant Vlahos and his wife share voting and investment power as trustees. Thus, Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren used their positions as members of the Board to cause the Company to pay dividends to themselves or to their affiliated entities amounting to almost $25 million, even as the Company suffered a net loss of $20 million in the second quarter

of 2021, when sales were decelerating and the Individual Defendants were causing the Company to issue false and misleading statements concerning its business, operations, and prospects. Defendants Bayne, Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren are therefore directly implicated in the unjust enrichment of Defendants Dahnke, Liaw, Liew, Pramanik, Vlahos, and Warren, who themselves received payments or whose affiliated entities profited from the payment of the 2021 Dividend. Accordingly, Defendant Bayne's, Dahnke's, Liaw's, Liew's, Pramanik's, Vlahos's, and Warren's misconduct in causing the Company to pay the 2021 Dividend precludes them from independently and disinterestedly investigating the misconduct alleged herein. Moreover, the 2021 Dividend was paid on June 29, 2021, when all nine Directors served on the Board. Accordingly, demand upon the Board is futile and, therefore, excused

156.   Defendants Gentile, Bayne, and Liaw (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times, with Defendant Gentile serving as Chair. The Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's legal and regulatory compliance, the Company's system of internal controls, and the implementation of the Company's internal audit function. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls and failed to ensure compliance with laws and regulations as they are charged to do. Moreover, the Audit Committee Defendants failed to implement an internal audit function which, according to the Company's Audit Committee Charter, the Company still lacks as of the date of the filing of this verified shareholder derivative complaint. In addition, the Audit Committee Defendants' failure to ensure that adequate internal controls were in place caused the Company to engage in the Stockpiling Misconduct, to issue false and misleading financial statements to investors, and to file a false and misleading quarterly report with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

157.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

158.   Honest has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Honest any part of the damages Honest suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

159.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

160.   The acts complained of herein constitute violations of fiduciary duties owed by Honest's officers and directors, and these acts are incapable of ratification.

161.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Honest. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Honest, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

162.   If there is no directors' and officers' liability insurance, then the Directors will not cause Honest to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

163.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

164.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Honest's business and affairs.

166.   Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Honest.

168.   In breach of their fiduciary duties owed to Honest, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's financial results were significantly impacted by stockpiling of the Company's products; (2) despite the negative implications of consumer and customer stockpiling behavior on the Company's future sales, the Company engaged in the Stockpiling Misconduct to support growth that was not reasonably likely to materialize; (3) the Company was experiencing decelerating demand for its products; (4) as a result of the foregoing, the Company's financial results were likely to be adversely impacted; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Honest's public statements were materially false and misleading at all relevant times.

169.   In addition to making the false and misleading statements in connection with the Company's IPO, the Individual Defendants made the false and misleading statements during the Relevant Period. Moreover, throughout the Relevant Period, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

170.   In further breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Stockpiling Misconduct.

171.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, including by failing to establish an internal audit function.

172.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Honest's securities.

173.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Honest's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

174.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

175.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Honest has sustained and continues to sustain significant

damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.   Plaintiff on behalf of Honest has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

177.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Honest.

179.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Honest that was tied to the performance or artificially inflated valuation of Honest, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes proceeds from the sales of the Company's securities in connection with the IPO, when the Company's share price was artificially inflated. This also includes compensation resulting from the $35 million 2021 Dividend payable to holders of the Company's common stock and redeemable convertible preferred stock as of May 3, 2021, which was paid on June 29, 2021. This further includes bonuses paid related to preparation for the IPO that triggered upon the closing of the IPO. Additionally, this includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

180.   Plaintiff, as a shareholder and a representative of Honest, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the 2021 Dividend, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based

compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

181.   Plaintiff on behalf of Honest has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

182.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Honest, for which they are legally responsible.

184.   As a direct and proximate result of the Individual Defendants' abuse of control, Honest has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.   Plaintiff on behalf of Honest has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

186.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Honest in a manner consistent with the operations of a publicly-held corporation.

188.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Honest has sustained and will continue to sustain significant damages.

189.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

190.   Plaintiff on behalf of Honest has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

191.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.   The Individual Defendants caused the Company to engage in the Stockpiling Misconduct and to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

193.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Honest to waste valuable corporate assets, including by stockpiling an additional $5.7 million in inventory and related costs and by paying the 2021 Dividend, and have caused the Company to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

194.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

195.   Plaintiff on behalf of Honest has no adequate remedy at law.

## SIXTH CLAIM
### Against the Class Action Defendants for Contribution
### Under Section 11(f) of the Securities Act and 21D of the Exchange Act

196.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.   As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Honest shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

198.   Federal law provides Honest with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

199.   The plaintiffs in the Securities Class Actions allege that the Registration Statement—including its amendments—and the Prospectus contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

200.   Honest is the registrant for the IPO. The Class Action Defendants were responsible for the contents and dissemination of the Registration Statement and Prospectus.

201.   As issuer of the shares, Honest is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

202.   The plaintiffs in the Securities Class Actions allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true and without omissions of any material facts and were not misleading.

203.   The Class Action Defendants, because of their positions of control and authority as officers and directors of Honest, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Honest, including the wrongful acts complained of herein and in the Securities Class Actions.

204.   Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

205.   As such, Honest is entitled to receive all appropriate contribution or indemnification from the Class Action Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Honest, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Honest;

(c)     Determining and awarding to Honest the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Honest and the Individual Defendants to take all necessary actions to reform and improve Honest's corporate governance and internal procedures to comply with applicable laws and to protect Honest and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Honest to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Honest restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: November 29, 2021                Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Hayato Ono am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _11/29/2021_____, 2021.

DocuSigned by:

F0DC5A5301474C1...

Hayato Ono